at all, arguing that there should be 15 minutes to be shared by a Senate and 15 minutes for Plaintiffs. Mr. Wade-Spice and Ms. Zimmer, students, please take your seats. Good morning. My name is John Base-Spice Jr. I'm here on behalf of Matthew Kraska, my colleague Jillian Dienhardt, here on behalf of David Mindick, and I would like to reserve three minutes for rebuttal. And are you splitting up the time somehow? Yes, Your Honor. I'm going to give Ms. Dienhardt three minutes at the end of, I'm sorry, the final three minutes here. Okay. Of your initial? Of the initial, correct. Okay. All right. Very well. We're here on a qualified immunity appeal, and obviously I know the panel is very familiar with the cases, the briefing, the record, and all of that. And it may be counterintuitive, but I'd like to start at the end of the underlying incident. And I'd like to start by addressing the fatal round fired by my client, Matthew Kraska, in self-defense that killed Dan Ficker. Officer Kraska and Mr. Ficker have been engaged in a prolonged, very violent struggle. Mr. Ficker tried to... You say prolonged. I understood that this incident really took a matter of minutes. Are you saying that something occurred prior to their arriving at the home where this occurred? No, Your Honor, but I believe that a physical struggle of this magnitude, a few minutes, is truly a prolonged struggle. I mean, when you think about boxing, three minutes is a round and they're exhausted. I mean, this was all-out fighting for, I think, about three to five minutes, but I think that is prolonged in the world of that type of combat. And during this struggle, Mr. Ficker tried to kill my client four times. That's admitted by plaintiff's expert. He tried to kill my client four times. He twice used his legs to wrap them around my client's neck. Let me ask you a question. If your client, if Mr. Ficker had been standing on the sidewalk and your client walked down the sidewalk and in his uniform, pushed him in the chest and said, I don't like you, buddy, and Ficker started to punch him and your client punched him back and Ficker tried to kill him and your client pulled out his gun and shot him, now would he be able to claim qualified immunity because it was self-defense? Yes, because there's a segmenting analysis, Your Honor. So while clearly he would be liable for the initial contact there, that was not a deadly force thing. He didn't try to kill Mr. Ficker, and that hypothetical that you just put forward there, and then Mr. Ficker reacted with deadly force. He used nonlethal force, a shove, and then a fight broke out in your hypothetical. Then Mr. Ficker escalates it to life or death, and then my client would still have the right of self-defense. But if he hadn't shoved Ficker in the first place, nothing would have happened. In your hypothetical, Your Honor? Yeah. I suppose so. In your hypothetical, yes, because you're having my client just approach him, and yes, I suppose that's true. I mean, we can always go back and say, you know, if this and if this and if this had never happened, but that's why we can't do it. We have to look at these specific moments. We have to look at these split-second judgments, particularly in a force case, you know, an excessive force case. There was multiple uses of force, but we can clearly differentiate between the strikes and the gunshot. I mean, that's deadly force, and that was the only deadly force. But in this case, though, don't you have a similar type of escalator? I mean, yes, Mr. Ficker hit the officer in the chest, and the officer said, I was basically unfazed by that, but he turned around and punched him in the face, and then things continued to escalate. So don't you have a similar situation there? And I want you to hone in on the four instances where Mr. Ficker tried to kill your client. I'd be happy to, Your Honor. The escalator is Dan Ficker. Dan Ficker escalated this to a deadly force situation. He twice tried to kill my client by— The punch in the face was not an escalator. That's not a deadly force escalator, Your Honor. No, no, I just said an escalator, because we're escalating to the point of deadly force. I disagree, Your Honor. I mean, I don't think it was an escalator. I think it was an instantaneous reaction to my client being struck by Dan Ficker in this situation. I think it was just that type of quick reaction that qualified immunity does protect with officers. The punch in the face, does that come after this sort of grazing or whatever, contact between— There's only one time it was described as a graze, but, yes, the graze comes first. I believe it was more than a— One time it was your client in the police report, if I recall. True, but the police report's not under oath. When he spoke under oath— But then he punches the guy in the face? I believe his exact term— It's not an escalation. And, first of all, I mean, one issue here with a lot of what you're saying in your brief is we have to see everything in the light most favorable to them. So if a jury could think graze, it's graze. It's not strike. It's not something more dramatic. So it's a graze, and then your guy punches him in the face. Jury might see it otherwise, but that's the way we're compelled to see it. It's possible, Your Honor, and I just—I feel the— If you want us to see it any other way, then it's a material issue of fact, and we shouldn't be hearing it on appeal. Well, then we don't have to talk about the graze. Like I said, I want to talk about the shooting, first and foremost. I mean, I think that's the most important thing here. What's the basis for the assertion that Thicker puts him in this scissor lock multiple times with his legs? The undisputed testimony of Officers Kraska and Officer Mendeck. You know, I mean, we get this all the time in 1983 cases. The officer's testimony is undisputed. I mean, that doesn't mean a jury would have to believe it. And is there—what does Ehlert or some of these third parties— Ehlert only saw a short portion of the fight, so I don't think he's in a position to— Was he asked about scissor lock? He was asked. His testimony was not taken in a deposition in this case, but it was used from a trial where David Mendeck was brought on criminal charges of dereliction of duty. So I don't think that was something that was even relevant in that trial. Was he asked about scissor lock? Not to my knowledge, Your Honor. I mean, maybe it's—I'm not recalling it. So, I mean, we have some scissor lock testimony that a jury would be free to disregard or find not credible. I disagree, Your Honor, and I think I spoke about this in my reply brief. I pointed to a Sixth Circuit opinion, and I'd like to try to find it here quickly. You're not obligated to believe the testimony of an officer or anyone else simply because, you know, there isn't contrary testimony. They could just say, I disagree with that, I don't believe that testimony. I believe I cite the case law in my reply brief that actually says that that's wrong, Your Honor. But credibility is always a jury determination. It's a fact finder determination. So no matter what the case says, the jury is the fact finder. They listen to the witnesses, and they decide, I believe all of your testimony and none of your testimony are a part of it. So that's just sort of basic. But, Your Honor, there's no one to dispute this testimony. There's no one who can do it. But jurors can also look at the totality of the facts and circumstances. They will weigh the actions of the other officer, Mindick, who was there. You're telling me that this mortal combat is going on, and a fellow officer is standing right there, not intervening, not doing anything. So the jury is going to weigh all of that in this whole scenario. And as Judge Kethledge said, we have to take things in the light most favorable to the movements. I appreciate that. Or the non-moving party, yes. I appreciate that. Pardon me, the non-movings. I appreciate that, Your Honor. But first of all, I disagree. I don't think David Mindick was doing nothing. But that's something that Ms. Steiner will address. Regardless, David Mindick, what he may or may not have been doing, is not relevant to my client. My client was trying to not die when this person was trying to kill him. So in addition to the two scissor locks, this is where he pulled his microphone off of his lapel and wrapped the cord around his neck in what must have been an attempt to strangle him, as well as when he went for Officer Kraska's gun. And in addition to the undisputed testimony, there's DNA evidence that Ficker had, I believe it's both DNA evidence and fingerprint of Ficker on Kraska's weapon when he went for his gun. If you're fighting an officer and you try to get the officer's gun away from him, the only reasonable conclusion is you're doing that because your intent is to kill that officer. So then after all this happens, Ficker charges at my client again when he's completely spent and exhausted, and my client fires a single round in self-defense. And I think if you look at the Mullinex case that I cited to you from the Supreme Court that just came out in November, so it's in my reply brief, not my merit brief, because I couldn't cite something that didn't exist. It's similar. It's something where a person, a suspect, made it very clear that their intention was to kill, and therefore deadly force was justified. Mr. Ficker didn't do it with threats like in Mullinex, but instead did it with his actions. He actively tried to kill Officer Kraska four times before Officer Kraska fired the single shot. I see my... One concern I have about, I think it's your brief, is you seem to weave some contested factual assertions throughout your description of the statement of facts and your arguments. For example, as I understand your brief, you're saying that Ehrbeck and Ficker tried to walk calmly. I'm sorry. You say that just from the get-go, Ficker is bellicose and going after the officers, right? Intoxicated and verbally belligerent, yes. But Ehrbeck says they were just trying to walk in the house when Officer Kraska comes up from behind them and yanks Ficker by the arm and pulls him back towards the driveway. She disputes that. Why are you saying that in your brief? Well, if you feel that way, Your Honor, then I apologize. I guess maybe I'm misunderstanding something. I mean, she says that, right? It's a fair characterization of her testimony. One thing you have to understand is that this... Start with whether that's a fair characterization of her testimony. It is a fair characterization, but this is happening in a very small area. The turn to walk away from the car to the front door, we're talking about five to six feet. A turn, I mean, she may have interpreted a turn when Officer Kraska didn't because it's that small of an area. It's not even as far as you and I are standing. It's this fact it's a very tight area. It's not this idea that she... But it was what was creating what blew up into this fight. And if we have conflicts of testimony about who was the instigator, doesn't that affect what flows from it? No. Under the segmenting analysis, the deadly force must be looked at by itself. It must be looked at by itself. Even if the officers create the situation that requires deadly force, the deadly force can still be justified. And in this case, it absolutely was justified in self-defense of his life. Well, I mean, as to the deadly force, as I understand what you're saying in your brief, Ficker does this sort of final charge at Kraska, right? Right. But what they say in their brief is that the two men were already adjacent to each other at this moment. There was no final charge, and Ficker is trying to turn away. There's no testimony to that. They just make it up. I mean, the depiction in your brief would suggest he'd be shot in the chest. He's doing a final charge. He's coming at Kraska. Fair? It would suggest he'd be shot in the torso, yes. Well, why wouldn't it be in the chest if he's charging? Kraska was coming from below. He was getting up off the ground. He was struggling. Well, you know where I'm going because you know the case. He's actually shot under the armpit, correct? I believe it's because Ficker's arms were probably up to attack. He was shot under the armpit, correct? Yes. So maybe a jury could say, you know what, I don't believe the officer's testimony, which is the point we were talking about earlier. And maybe defense or the plaintiff's counsel has a point that they were close and this guy was trying to turn away, and that's why he was shot here rather than here. And if it's the case, why shouldn't we take that view rather than your view of a final, dead-on charge? If in that final moment he turned away and Officer Kraska still believed he was a threat to his life, that's the type of reasonable mistake of fact that is still covered by qualified immunity. We're talking about two different sets of facts, which seems to be the problem. To me, those differences of facts make this a case on qualified immunity which should not be on appeal at this point. You need a finder of fact to determine what actually happened, and it should go before a jury. Obviously, I disagree, Your Honor, but I understand. Okay. Well, we'll hear from counsel for Officer Mindek. Thank you. Good morning, Your Honors. Good morning. My name's Jillian Dinehart. I'm here before you today to represent Officer David Mindek. I'd like to start by saying I understand where you're coming from as far as there may be two different issues of fact here or two different stories, but I would like to say that as far as the story goes to David Mindek, there is no disputed fact. By your own characterizations, Officer Kraska took the lead as far as any type of aggression or any type of initial detainment. Should we even find there was detainment? The reason we weren't talking about Officer Mindek is because it wasn't his turn. Fair enough. I mean, your brief says Mindek calmly approaches Erbach and tries to explain the situation. She says in her testimony that Mindek, right off the bat, is screaming at her or, I'm sorry, screaming at Ficker or both of them about stealing this jewelry. She says that. Okay. Totally contrary to what the blue brief is saying. Okay. We don't have jurisdiction to arbitrate this sort of stuff now. So I guess I would just reiterate what Judge Roth just said. I mean, how do we have jurisdiction to arbitrate this now when you are presenting to us material facts that are disputed by testimony that a jury could choose to believe over your version? Thank you for your question, Your Honor, and I understand where you're coming from. There are two different facts as to whether or not he approached Ms. Erbach and Mr. Ficker, allegedly screaming about the theft or the alleged theft, excuse me. But that does not go to whether or not he intervened appropriately in the use of force or whether or not he engaged in a false arrest here or whether or not there was an intentional infliction of emotional distress or whether there was assault and battery here. I think that the appropriate questions begin after, if we take Ms. Erbach's testimony as truth as we must today, it begins after Officer Kraska takes Mr. Ficker to the zone car. Why are these things in the brief in the first place? Why do we have to sift through this and figure out what actually is undisputed, where you're actually following the standard that applies here and where you're not? I mean, at some point, you know what we just say? You knew coming in that you cannot rely on disputed facts, and you're doing it there? And, you know, with respect to the degree to which Mendeck is involved in the altercation, they say he's just anytime that Ficker sort of starts to do well in the fight, Mendeck holds his arm back or something. That's what they say. I mean, I'm not sure what you're going to say. I mean, it seems like he's just standing around while this is happening. Well, I would agree that he intervened and did pull arms back and did hold onto Mr. Ficker's legs, but the characterization that he did just so, just so there could be parity in the fight, I think is not something there's testimony to, and there's certainly nothing in the record that says that that's why he did it. There's no intentions here. Well, no, I just, you know, it just seems to me that everything that has been said right now in the briefs and what you said here this morning just points to a clear issue of fact that it's not appropriate for summary judgment in the qualified immunity analysis. I think his actions, their actions have to be put to a fact finder, and here reasonable jurors could certainly look at all of these facts as they should and determine the propriety of actions in that circumstance, in that, as your co-counsel said, in that mortal combat period. They can set that kind of stuff out. I would like to respond to that. I see my time is up, but just to answer your question from my point of view here is that the plaintiffs still need to present something that is different than what we have presented here, and other than, as you've mentioned, the yelling back and forth as to my client, there is nothing different to be said here. In fact, we agree that he intervened. But it's not a matter of them saying something different, and they do say something different, but this whole circumstance raises material disputed issues of fact, and we judges and the trial judge at the summary judgment stage is not supposed to weigh the evidence. They're supposed to look at surely qualified immunity is a legal determination, but they're not to look at those facts and weigh them. That's the fact finder's job, and I think that when we get down to the core, both of you have really admitted here today, reluctantly perhaps, but that there are material issues of fact. I agree with you, Your Honor, as to what your role here is today, but I wholeheartedly disagree with you as to whether or not there is a disputed material issue of fact as to Officer Mendeck, and with that I'll close today. Thank you. All right. Very well. Thank you. Your Compliance Counsel. Thank you, Your Honors. My name is Terry Gilbert, along with Gordon Friedman. We represent the estate of Daniel Ficker. I had this great argument prepared, but I think the Court has pretty much said what I would say, and that is that clearly there are litany and a series of events of disputed facts that render this appeal without jurisdiction. I don't think we have to go any further than that. Let me ask you a question. The question of whether the two police officers in Parma, outside of the Cleveland jurisdiction, were in pursuit of a suspect that they were properly acting as police officers in the first place. Thank you for the question. They were not in pursuit. The party that occurred at the Mendeck home. Do we have to decide that issue? Do we have to decide whether Ohio law on pursuit covers what these officers were doing, or if we should decide to send this case back to the district court, should we give the district court guidance on that issue? I don't think it needs to go back to the district court, because I think these are just— If we decide that there are material issues of fact and qualified immunity should not be granted, it will go back to the district court for trial. For trial. Yeah. And in preparation for that trial, should we instruct the district court on whether these officers should be, as a matter of law, considered to be in compliance with Ohio law? Well, I think that this is part of the totality of the circumstances. The authority of these officers from Cleveland, one off-duty, one on-duty, their behavior in not giving the facts to the supervisor that he was bringing an off-duty person who was personally involved through his wife in the situation and not— A victim. A victim. And the whole thing with the jewelry thing is ridiculous. I mean, there was absolutely no—even the internal affairs found that there was no basis for an arrest or detention. And to then go off on a frolic into another jurisdiction 10 miles away, wait for Ficker and Erback to come home, that is an issue of the background, preliminary mental state of these officers that a jury can weigh in terms of their authority to even be at that house, not even call for backup, not notifying PARMA. And then they arrive, and these people show up, pull into their driveway, thinking they're going to come home on July 4th, and they're confronted in a very aggressive way by the cousin's husband. They're trying to go to the door. He doesn't want to talk to them. He doesn't even know what they're talking about, and there's this unlawful detention. I just want to intervene and ask if you are en route to answer Judge Roth's question. Yes, right. Okay. Well, no. The answer is that it should go back for a full trial, and the jury can be instructed on that issue if necessary. So that we should not opine on the issue of whether the officers were operating appropriately under Ohio law and being in PARMA in the first place. I think that's an issue for the jury. I really do. Because that in itself is not a Fourth Amendment violation. That's just the totality of the circumstances that a jury can weigh in reviewing the credibility and the actions of the officers as the events progressed. So I don't think that needs to go back. And then you have, as Judge Oliver pointed out, a real serious question as to whether detaining Daniel Ficker was appropriate when you have a right to refuse not to answer questions. I mean, what did they expect that they were going to find out by going there with two officers, confronting them? He doesn't want to talk. He had no right to grab him and pull him over to the police vehicle and then shove him on the hood, try to pat him down, and then when he moves and incidentally touches him with his elbow, he sucker-punches him, Kraska sucker-punches him in the nose, brings him down. He was trying to try your case here. Yeah, so I'm just going to stop now and ask if you have any other questions because I think you understand the case. Thank you. I think what Mr. Gilbert said towards the end there is important. One of the things that he was trying to characterize what Mr. Ficker did is he said, oh, he incidentally grazed him. Well, Mr. Gilbert said that, but there's absolutely nothing in the record to support this idea it was incidental. Let me ask you another question. If the officers were in Parma inappropriately in violation of regulations, are they entitled to qualified immunity in the first place? Absolutely. Regulations, you mean Cleveland Police regulations, have no bearing. Well, Ohio law. They were not in violation of Ohio law. Well, if we should determine that under the concept of pursuit that they should not have left Cleveland to go to Parma, if they are not there as authorized police officers, are they entitled to qualified immunity in the first place? Well, Your Honor, it wasn't an issue of pursuit. It was an issue of investigating a crime in Cleveland, and they are police officers. That's a statewide designation. Are they performing their official duties if they shouldn't have been there? Officer Kraska was absolutely performing his official duties. The idea that there's potentially a department regulation that says he shouldn't have been there, which I disagree with, but even if that is the case, that has no bearing on the legal question. A department can put additional regulations on their employees, and if you start mixing those and mingling those with the law, it would have a massive chilling effect on a department putting any regulation on their employees other than saying, just follow the law. They went to Parma to investigate a crime in Cleveland. If a Cleveland officer can't leave the city of Cleveland to investigate a crime, then anyone who commits a crime in Cleveland, once they cross the border, they're scot-free. Or we have to ask a suburb that doesn't have the resources to take over the investigation and start transferring things around. It doesn't make sense. Is there something in there that says that Parma didn't have the resources? It doesn't matter. That's just a hypothetical. Then why did you make that statement?  We have limitations. I appreciate that, Your Honor, but I think if you look at their alleged disputed facts, they're just not supported with anything. They are just baseless allegations. Look at the underlying record. And I found page 11 of my reply brief is where I discussed the issue that a trier of fact may not just hope. A trier of fact won't believe a witness. They must actually have evidence in the record that contradicts. And there's nothing in the record. They're just statements. He shot, and he shot in the armpit. So they might draw some inferences from that. He shot in the armpit after he tried to kill my client four times. It may have been a mistake of fact, but it's the type that should be... We're going to try the case here again.  Thank you for your arguments. Case adjusted. Thank you, Your Honor.